Lawrence *v.* King, Appellant.

Argued February 4, 1930.   Before Moschzisker, C. J.,
Frazer, Walling, Simpson, Sadler and Schaffer, JJ.

570

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

*J. B. Hannum, Jr.,* of *Hannum, Hunter, Hannum & Hodge,* with him *S. Edward Hannestad* and *J. Allen Hodge,* for appellant.—The intention of a grantor in a deed is to be gathered from the language of the deed itself, and, where it is attempted to show that the grantor did not intend to make an absolute conveyance, the burden of showing this is on him who alleges it, and the burden is not a light one: Meyers v. Robinson, 74 Pa. 269; Loughran v. Kummer, 297 Pa. 179; Lingenfelter v. Richey, 62 Pa. 123; Lawrence's Est., 286 Pa. 58.

No confidential relationship was shown to exist between plaintiff and defendant: Leedom v. Palmer, 274 Pa. 22; Grace v. Moll, 285 Pa. 353; Lawrence's Est., 286 Pa. 58; Hamilton v. Fay, 283 Pa. 175; Moorhead v. Scovel, 210 Pa. 446; Weber v. Kline, 293 Pa. 85; Pusic v. Salak, 261 Pa. 512.

Plaintiff had independent legal advice: Knowlson v. Fleming, 165 Pa. 10; Hollenback's App., 121 Pa. 322; Neal v. Black, 177 Pa. 83.

There was no such conduct on the part of defendant as to constitute a constructive fraud on plaintiff, from which a constructive or resulting trust in favor of the latter arose or resulted by implication, construction or operation of law.

The evidence to establish a resulting trust must be "clear, precise and indubitable": Earnest's App., 106 Pa. 310; Robinson v. Powell, 210 Pa. 232; Walker v. Walker, 254 Pa. 220.

A trust ex maleficio can arise only before or at the inception of the title, and the evidence in support of it must be clear, precise and convincing: Jourdan v. Andrews, 258 Pa. 347; Johnson & Johnson v. Shrawder, 80 Pa. Superior Ct. 125; Turney v. McKown, 242 Pa. 565.

*William C. Alexander*, for appellee.—In view of the age of plaintiff at the time the deeds here involved were signed, his physical and mental condition and all the circumstances under which the conveyance was made, as well as the undisputed relationship of principal and agent, the law imposes on defendant the burden of showing that he took no undue advantage of plaintiff: Hetrick's App., 58 Pa. 477; Leedom v. Palmer, 274 Pa. 22; Potter's Est., 6 Pa. Superior Ct. 627; Stepp v. Frampton, 179 Pa. 284; Darlington's Est., 147 Pa. 624; Light v. Light, 221 Pa. 136; Matthaei v. Pownall, 235 Pa. 460; Corrigan v. Conway, 269 Pa. 373; Allegheny By-Product Co. v. Hillman, 275 Pa. 191; Quell v. Boyajian, 90 Pa. Superior Ct. 386; Brew v. Hastings, 206 Pa. 155; Com. v. Shirley, 152 Pa. 170; Clegg v. Casting Co., 34 Pa. Superior Ct. 63.

The written instruction for transfer of the property constituted a direction to convey for a specific purpose and not as a gift.

The court properly ordered reconveyance on the ground of fraud and undue influence regardless of whether the conveyance was intended as a gift or for a specific purpose only: Harrison v. Welsh, 295 Pa. 501; Longenecker v. Church, 200 Pa. 567; Hasel v. Beilstein, 179 Pa. 560.

OPINION BY MR. JUSTICE SADLER, March 17, 1930:

A history of the events leading up to the present litigation is detailed in an earlier proceeding which was the subject of consideration by this court, and will be found set forth in the opinion reported in Lawrence's Estate, 286 Pa. 58. A brief résumé, however, of the relations of the parties now before us must be given so that the present matter in dispute may be understood. Lawrence, the father of eight children, died in 1885, leaving real property, since largely increased in value. Three of them, Mordecai, J. Lewis and Elizabeth, resided for many years in the family homestead until the death of the latter in 1915. The nearest relatives to the three mentioned were nephews and nieces, living at other places. The two surviving brothers, with whom the sister had spent her life, were, by her will, given life estates in her property, the remainder being devised to the other blood relations. Dissatisfaction was expressed by both, asserting, as they did, that this disposition of her estate was contrary to an understanding between them, and a contest of Elizabeth's will was threatened, or begun, prior to the death of Lewis, and the dispute was not adjusted at the time the deed questioned in the present case was executed. The two brothers, in July, 1921, executed mutual wills, each leaving his share in their father's property to the survivor, and devised the remainder to one Swartz, the tenant of the property where they resided, so that the nephews and nieces, whom they accused of exercising undue influence on Elizabeth, should receive nothing.

Mordecai and Lewis were bachelors, living together, and the necessary care of the house was performed by paid housekeepers. Ultimately, they became dissatisfied with their tenant Swartz, and solicited King, the present defendant, to move with his family from Philadelphia, and take charge. They had known him from boyhood, and apparently deemed the suggested arrangement to be to their advantage. In 1923, at inconvenience and

some financial loss to himself, the defendant, accompanied by his wife and children, came to the Delaware County farm, and King remained there until the present dispute arose. In 1922, shortly before his arrival, new wills were executed by the brothers. In both instances the nephews and nieces, from whom the old gentlemen were estranged, were ignored as legatees, each being given only the nominal sum of one dollar. By the testament of Lewis, King was named a devisee if he survived Mordecai, and he was designated as executor. In the first will of Mordecai, Swartz was named remainderman, but in the second, executed later, he substituted King, as appears by testimony of record. In 1923, Lewis, the older of the brothers, then aged eighty-one, died. A caveat was filed against the probate of his will by the nephews and nieces, averring testamentary incapacity and undue influence by Mordecai, who was asserted to have held a confidential relation, and taken advantage of his position to secure its execution, which was claimed to be unnatural, as indicated by the devise to King of the remainder of the estate, if he survived the testator's brother. For the reasons given, the lower court sustained the contention of contestants, but its ruling was reversed, and the orphans' court was directed to probate the paper: Lawrence's Est., supra. What was there said as to the relations of the various parties here concerned, and particularly as to those of Mordecai and King is illuminating. In closing the opinion in that case, it was observed on page 72: "As the property now stands Mordecai can dispose of it as he sees fit; it is highly probable, if treated fairly, he will deal equitably and justly with those of his own blood."

The will case was decided on March 15, 1926, and naturally Mordecai had become even more embittered towards those who had endeavored to prove their charge of wrongful conduct influencing the preparation of the will of Lewis, with whom he lived. Hon. Francis Shunk

574

Brown, former attorney general of Pennsylvania, appeared as counsel for proponent in the will contest, and was successful in defending against the assertions made by the contestants. After the decision of this court, Mordecai called upon his attorney, in the late spring or early summer, for the purpose of procuring a conveyance of certain interests in the real estate to King. At the time, he fully explained his desires and intentions, stating his reasons for deeding a part of his property. The effect of his proposed action was fully made known to him, but the court has found that Mordecai was not able to mentally grasp the situation and the result of his contemplated conveyance,—a mere deduction, without any support in the evidence of record. So that due consideration might be given, and no step taken until after proper reflection, he was advised to put his thoughts in writing, and this he did. On October 20, 1926, the instructions were presented to his counsel, with the request that a deed be prepared to King for a fractional interest in the land which he owned, so that the grantee and his family should have the title to the property described, and be placed as well in a position to defend any legal attack the nephews and nieces might make to set aside the transfer.

King was no stranger, having known the brothers from boyhood, and he moved to the farm, at their request, in 1923, so as to furnish them aid and assistance. Though he disbursed their funds, by direction, and used, also, the proceeds of certain Philadelphia property, then owned by him, in maintenance and improvement of the Lawrence homestead, yet he could not be said to have been their confidential adviser. Even if so, it was shown, under the facts here disclosed, that he exercised no undue influence in securing the grant to him. He had assisted Lewis until he died, and, thereafter, aided Mordecai, though the latter continued to control his own affairs, executing leases and collecting rents. King managed the household from the time of his arrival in

1923, making outlays on behalf of the brothers, paying bills, and, by their order, for this purpose using funds belonging to them, as well as his own. By Lewis's will, probated in 1925, he was named devisee of the realty, contingent upon surviving Mordecai, and was also appointed executor of the former's will. Later, he filed his account of the moneys received and payments made, which was approved by the orphans' court in 1928.

General Brown prepared one of the conveyances now in question, and mailed it to plaintiff, who kept the same in his possession for six weeks. On November 18, 1926, he went to the office of his counsel, and, in the absence of King, after a full discussion and explanation of the contents of the documents with General Brown and A. Carson Simpson, Esq., associated with him in the practice of law, executed the deed in question. The trial judge finds, and the members of this court well know, the high standing and integrity of both of the attorneys referred to. The effect of transferring an absolute and unconditional title to the grantee named, was fully explained to the grantor. Though advanced in years, the capacity of Mordecai to conduct his business matters at the time was clearly established, and he was amply advised that he was giving up all the interests deeded, as he desired and intended. The papers relating to partition proceedings, having for their purpose the severance of the interests of the nephews and nieces in the land, were executed at the same time. To correct an error in description, a second deed was signed later on February 15, 1927. No one can read the testimony of the eminent counsel who prepared the papers here involved, and come to any other conclusion than that Mordecai had adequate knowledge of the extent of his property and the part he was giving away, well knew what he was doing when he transferred the interests now in question, and had ample reason, from his standpoint, for doing as he did, and purposely made King the owner, thus carrying out the

intention previously disclosed by his own will and that of the deceased brother.

The partition proceedings were instituted in November of 1926, but not brought to hearing until the summer of 1927. Later in the same year, he resumed friendly relations with his nephews and nieces, and departed from his old home, due to a disagreement with King. In January, 1928, the bill now in suit was filed, seeking to set aside the deed to defendant, on the ground that the grantor was mentally incompetent when the conveyances were executed, and that the same had been obtained by the exercise of undue influence, without consideration. The only decree asked, except the prayer for general relief, was the cancellation of the deeds and the restraint of defendant from encumbering the property. The learned court, after hearing, made extensive findings of fact and conclusions of law, and filed an exhaustive opinion, supporting his viewpoint by an elaborate discussion. A decree nisi, containing 16 paragraphs, was entered, by which all the relief asked for was granted, and, in addition, directed the release of a $30,000 mortgage which King had placed on his Philadelphia property and on that conveyed to him, as well as an accounting of all moneys at any time received by defendant from the Lawrences, appointing an assessor to determine this amount. It entirely overlooked, however, the legal requirement that an order in such cases must be limited to the relief prayed for in the bill on which the proceeding is based (Luther v. Luther, 216 Pa. 1; Spangler Brewing Co. v. McHenry, 242 Pa. 522; King v. York Trust Co., 278 Pa. 141; Eddy v. Ashley Boro., 281 Pa. 4), if any at all is to be awarded. The many exceptions filed by defendant were disposed of by the court in banc in a second extended discussion written by the trial judge, in which many cases are cited supplementary to the large number to which attention had previously been called.

Though the record in its entirety has been carefully examined, the many conclusions can be but briefly referred to, if this opinion is to be confined within a reasonable compass. Attention should first be called to the principle that, though findings of fact are ordinarily binding on a court in banc, as well as the appellate court, upon which line of authorities great stress is here laid, yet it must be kept in mind that this rule cannot be applied where there is no evidence to justify the conclusion in question, nor is it controlling where constituting a mere deduction from facts actually proven: Hamilton v. Fay, 283 Pa. 175; Crick v. Paull, 287 Pa. 431; Fidelity-Phila. Trust Co. v. Coal Co., 294 Pa. 47. It may primarily be noticed that the court found in the present case that plaintiff conveyed the property involved with full knowledge of the effect of his action, after consultation and advice from undoubtedly able and disinterested attorneys, and, though of advanced age, and, therefore, more susceptible to influence than one of less years, yet there was no evidence which manifested any extreme infirmity or mental weakness. It further determined, in its 28th finding: "The full purpose and effect of said written instructions were fully explained by the said Francis Shunk Brown, Esq., to the said Mordecai Lawrence before the said Mordecai Lawrence signed the said instructions, and said instructions were fully understood by the said Mordecai Lawrence who stated that that was what he wanted to do." It also found plaintiff knew the value of his property, and "it was his full purpose and intention to convey said property" to the grantee named. As was said in the recent case of Thorndell v. Munn, 298 Pa. 1, 10, where the attempt was made to set aside a transfer by an elderly donor: "While a court of equity should, in proper cases, unhesitatingly set aside gifts between persons situated like decedent and defendant, 'the power to do so is of an exceedingly delicate character, not to be lightly exercised, and only to be invoked when the manifest justice

of the case requires it.' " In the case before us, the trial court was deeply impressed with the fact that, as the grantee was not a blood relation, the transaction was so unnatural as to indicate it to be unconscionable. In view of the evidence disclosed by the record, the deprivation of the nephews and nieces of any interest in his property, when the deed was made in 1926, seems to us to justify the opposite conclusion.

The court below determined the property in question was held on a constructive or resulting trust, and that King was as well a trustee ex maleficio, thus justifying the decree complained of. Mordecai, though eighty-five years old, was mentally competent, and the court so found, though declaring that, by reason of age, he was more easily subject to the influence of others. The only medical testimony to show incapacity was that of Dr. Thomas, and an examination of it will show that, as proof of such condition, it is quite unconvincing, and the court did not base a finding thereon. The remarks made in Phillip's Estate, 299 Pa. 415, may well be applied to this expert testimony offered: "Upon this point, therefore, we need only again state, what we have often said, that, under such circumstances, the opinions of physicians, like those of other experts, are valueless, because being 'opposed to established facts [they] are not entitled to much respect' (Draper's Est., 215 Pa. 314; Klein's Est., 207 Pa. 191); especially as this character of testimony 'is weak of its kind, and its kind is the very lowest that is ever allowed in a court of justice . . . . . . [besides which] the entire failure to show a single unbusinesslike act on his [testator's] part, would so far neutralize the theoretical opinions of the physicians as to his mental capacity . . . . . . [as to render them] insufficient to go to the jury': Central Guarantee Trust & Safe Deposit Co. v. White, 206 Pa. 611, 615." In the contest of the will of Lewis, where Mordecai was the proponent, we then said (page 65), "Old age, sickness,

distress or debility of body neither prove nor raise a presumption of incapacity"; and, in referring to the present plaintiff, as he appeared when his brother's will was contested, less than two years before the deeds now questioned were executed (pages 69, 70), "When Mordecai appeared before the register, his examination, barring some minor matters, consisted of clear, concise, intelligible statements, well phrased and indicating he understood everything. His cross-examination did not disturb him much, and, considering his age and what the refusal of such person to directly answer some questions meant, his examination was without fault." No evidence was offered to show a weakened mentality thereafter, and Dr. Thomas, the plaintiff's expert, said he was better in 1928 than two years before.

Having determined the grantor was capable of transacting business, we are next concerned with the position of King. He was not a stranger, having been a friend for years. He came, after solicitation, to the Lawrence house with his family in 1923, to take care of the two brothers, giving up his own work in Philadelphia. Before his arrival, both Lewis and Mordecai had made wills providing that he should become owner of their interests, when the survivor died. He performed the necessary services about the house, making on his own account some outlays for improvements, and supplying essential maintenance, at the direction of the brothers, from their funds. He was executor of Lewis's estate, and, in 1928, duly accounted to the orphans' court for the funds received and expended in that capacity. From 1923 to 1927 he was engaged in straightening out the involved titles to lands in which the estate was interested. All of this time Mordecai was attending to his own business affairs, signing leases and collecting rents, and, in 1928, two years after the deeds were made, executed a judgment for $4,000, and a mortgage for $10,000, to others, neither of which transactions is assailed as improper or made by one incompetent. He

successfully carried on the will contest, and consulted fully with his attorneys, making the transfers now complained of after giving written instructions and being advised as to their effect. The court was impressed, however, with the fact that the plaintiff received but a comparatively small amount of cash from his brother's estate, but that is scarcely a reason for imputing misconduct when King's accounts as executor were passed on and approved by the orphans' court. It is true, cash was drawn from the trust company and expended by King in the maintenance of those resident in the homestead, but this was done at the request of plaintiff. An examination shows these withdrawals began in 1923, and a considerable portion of the sum involved had been so used before the conveyance in question was made, and were not complained of by plaintiff until this suit was instituted. The giving of a mortgage in 1927, after the deeds were executed, embracing the land owned by him in Philadelphia, and the interests transferred to him by Mordecai, cannot be said to indicate wrongdoing, and this transaction is not asserted to be fraudulent in the bill filed.

King and his family lived with plaintiff at his request, and performed the services contemplated and required. We are not convinced that he bore any such confidential relationship, within the legal meaning of that expression, so as to give him any overmastering influence on plaintiff, and was thereby enabled, because of any mental or physical infirmity of the latter, to obtain some advantage, undue and unintended by plaintiff. A mutual friendship or reliance on another, arising from previous business relations, is not enough to shift the burden of proof to the donee to show the fairness of the transaction attacked. The evidence discloses plaintiff attended to his own business affairs, and that the acts performed by King were done at the former's request. "Where undue influence and incompetency do

not appear, and the relation between the parties is not one ordinarily known as confidential in law, the evidence to sustain a confidential relation must be certain; it cannot arise from suspicion or from infrequent or unrelated acts": Leedom v. Palmer, 274 Pa. 22, 26; Grace v. Moll, 285 Pa. 353.

If, as clearly appeared, Mordecai had mental capacity, he had the right to convey any property owned by him to another, though no valuable consideration passed: Weber v. Kline, 293 Pa. 85. The court below found as a fact (No. 24) : "There was no agreement that the conveyance was made in consideration of services rendered or to be rendered by defendant to plaintiff." It was a voluntary gift, carrying out the purpose, long entertained, of depriving the nephews and nieces of any interests in the property conveyed. If there was a confidential relation between grantor and grantee, the burden of proving the transaction to be free from fraud, and made without the exercise of undue influence, shifted to the beneficiary, as has been held in many cases. Even if this rule be applied here, the facts disclose these deeds executed by Mordecai were purposely and knowingly made, and not induced by any improper pressure of King.

As was said in Keen's Est., 299 Pa. 430 : "Assuming, but not deciding, that, because of his being her attorney in fact [in this case a friend, or at most, employee], a confidential relation existed, yet, unless [the] mind [of the grantor] was enfeebled by bodily ailment or otherwise, the burden was not cast upon [King] of [dis-] proving undue influence. The burden shifts only where there is evidence of weakened intellect." See also Llewellyn's Est., 296 Pa. 74. The mentally competent grantor knew, when he made the free and voluntary gift to the grantee, the value and extent of the property, and transferred it to the only one who had done anything for him for some years prior to its execution. He expressed no dissatisfaction until after a difference

arose, when reconciliation with those previously alienated had been accomplished. It must be clear that no requirement of the rule of public policy, invoked for the protection of those who need it, has been violated. These are the thoughts expressed by this court in its opinion by Mr. Justice SIMPSON, in one of its latest declarations (Thorndell v. Munn, supra), and apply to the present situation. King had been made a devisee by both Lewis and Mordecai before coming, by request, to live with them. He had aided the latter in the settlement of the former's estate, and was the individual whom he desired to benefit, because of his then dislike of his only blood relations, which continued until 1927. The deeds were prepared and executed months before, after due deliberation, and on advice of able counsel as to their effect. It was only when he forgave and resumed his friendship with his nephews and nieces that he changed his mind, and endeavored to revoke what he had voluntarily and knowingly done.

The court below conceded the capacity of plaintiff to transact business, yet held that, as King was his confidential adviser, he was in position to take advantage of the former's enfeeblement resulting from age, and did so, though holding there was "no actual fraud or undue influence exercised." Seizing upon one paragraph of the written letter of instructions sent by Mordecai to his attorneys, it held that the purpose of the deed was solely to furnish King with the means for raising money to carry on the partition proceedings against the nephews and nieces, in case the grantor should die before the same were completed. To so hold is to disregard the other parts of the same paper, one of which reads: "Because I want the said Edwin J. King, Sr., or, if he be dead, his family, to not only have the above interests, but all the interests of my estate that I shall die seized and possessed of real, personal and mixed." The conclusion reached by the trial judge also makes necessary

the disregarding of the testimony of General Brown and A. Carson Simpson, Esq., both attorneys for the grantor. Having reached the view expressed, it determined King held the land under a constructive, and also a resulting, trust. Under the facts presented in the case, it was neither. Here was a voluntary gift, which transferred the title to King, as plaintiff plainly intended, with full knowledge of the facts and consequences.

It is argued that the conveyances, though purposely made, were executed for two specific purposes, neither of which was carried out, and, therefore, are ineffective, and King becomes a trustee ex maleficio. The court suggests that the deeds were given solely to enable defendant to raise money to finance the partition proceedings and the litigation pending to set aside the will of J. Lewis Lawrence, plaintiff's deceased brother. As to the second reason, the court seems to have overlooked the fact that the will contest had been entirely concluded when the deeds were made in 1926; and, as to the former, the written instructions as a whole show the purpose of the grantor was to transfer the land to the King family, and deprive the nephews and nieces of any possible future interest therein.

A more detailed discussion of the findings and the evidence on which they are based, though largely deductions or inferences from facts proven, is not practicable, nor will space permit a more extended review of the legal principles involved, or make it possible for us to comment on or distinguish the very many authorities cited. We have referred to the general rules applicable to the case before us, and have carefully perused the entire record and attempted to apply them to the situation disclosed. As we view the case, there was here a voluntary gift by one fully competent, made without the exercise of any undue influence. It was an intentional transfer executed in 1926, carrying out an intention shown to exist when the mutual wills of 1923 were signed, and at a time before King moved to the home, for the ex-

press purpose of keeping the land from the ultimate possession of those against whom the grantor, at the time, and for reasons which he deemed sufficient, felt aggrieved. True, his desires have changed, but no legal reason has been shown for setting aside his voluntary and clearly intended act, well understood by him.

The decree is reversed and the bill is dismissed at the cost of appellee.