John D. McCormick, and John D. McCormick, Executor, v. Hugh M. McCormick, Benjamin N. McCormick, Ellen S. Glass, George N. Glass, Sadie E. Smith, William S. Glass, Benjamin McC. Glass, Emma L. Glass, Ida M. Glass, the last three being minors, and having for their Guardian William S. Glass, Appellant.

*Wills—Issue devisavit vel non—Credibility of witnesses—Expression of opinion in charge.*

On the trial of an issue devisavit vel non, where the evidence is contradictory and the case turns almost wholly upon the credibility of the witnesses, an expression of an opinion by the trial judge in his charge,

though dangerously close to the line of trespass on the province of the jury, is not a ground for reversing the judgment, if it appears that there was no erroneous statement of the law, no suppression or distortion of the evidence, and no imposition of the judge's opinion as binding on the jury.

In an issue devisavit vel non the judge sits as a chancellor, and must be allowed a very large discretion in his control of the findings.

Argued Oct. 27, 1899. Appeal, No. 51, Oct. T., 1899, by defendants, from judgment of C. P. No. 2, Allegheny Co., Jan. T., 1898, No. 773, on verdict for plaintiffs. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN, FELL and BROWN, JJ. Affirmed.

Issue devisavit vel non. Before WHITE, P. J.

The court charged as follows:

Joseph S. McCormick owned a farm in Robinson township of this county, where he lived. It seems he was a bachelor. On December 5, 1896, he took sick, and continued to get worse until December 24, when he died of typhoid fever, turning in the end towards pneumonia. According to the papers here he had an estate of about $4,000 of personalty, and real estate, over and above any incumbrances, worth about $12,000. His whole estate, therefore, would be worth about $16,000. During his sickness a man by the name of George W. Buntin was called to act as nurse for him, and remained with him until after his death. On December 16, a man by the name of Beers was brought there, and I infer from the evidence that he was a cook in the establishment. On the first night that Beers was there, according to the testimony of both Beers and Buntin, about 12 o'clock, or something after that, Mr. McCormick asked Buntin if he would do some writing for him. Buntin said he would, and McCormick told him to go in the adjoining room where he would get some paper. He came back with that paper and then some remark was made that there ought to be another witness. Buntin explains that he did not want to take the responsibility of it himself and wanted another witness. Buntin says he got the Bible, and laid the paper on the Bible, and that Mr. McCormick dictated what he wrote, and that he wrote it precisely as McCormick dictated it, and after he had written it

in place of McCormick signing it, that McCormick told him he was too nervous or weak, and for Buntin to write his name and that he would touch the pen or paper, and Buntin says that was done. Beers says the same thing, and Beers and Buntin both state what he said, and that the writing was precisely what he had dictated to be written. Beers was not able to write his name as a witness, but he told Buntin to write his name as a witness, and that he would also touch the pen or pencil, and that was done.

Buntin says that he folded up that paper, put it in an envelope, and kept it at the house there until after the funeral, and then took it to his house, and never said anything to any person about it, that is, as to what the paper was, until some time in February of 1897, when, seeing some notice in the papers of some trouble between the brothers about the estate he made some inquiries, and finally wrote to John D. McCormick about it, and John came to see what the paper was. At first Mr. McCormick was alone, and Buntin would not show it to him. The next day two other parties came with John McCormick, and they all testify that Buntin got the envelope, opened it, and took out the paper; that they all read that paper, and that this paper produced here in court is the paper that was produced at that time by Buntin.

Buntin says that he did not know it was a will until the trouble arose, when he was finally told that, in law, it would be a will. As I said, no layman who read this paper, without knowing some decisions of our courts, would ever think that this was a will, but, under the rulings of our court, it is, in law, a will.

I will read the paper. It is dated at the top,. "Remington, Penna. made this 16th day of December, 1896. This is to certify that Joseph McCormick requested me his nurse, George W. Buntin, to write the following statement." He does not say "to write a will," but "to write the following statement." Then it goes on: "I, Joseph McCormick want my brother John McCormick to settle mother's business that I was to settle, and also all of my business provided I do not live; I also want my brother John to have $3,000, more than his equal share with the rest of the heirs." That is the paper, signed by directions, according to the testimony of the witness, "Joseph

McCormick," and then the names of the two witnesses, George W. Buntin and James Beers.

I would make the remark, gentlemen, to you here, that you are not to take the statements as made by counsel, unless they correspond with your recollection of the evidence. Even if the court should state the evidence you are not to take that statement from the court unless it corresponds to your recollection. Sometimes counsel, in the earnestness of their effort for their client, may try to throw their feelings and their belief into the jury; that is all wrong. It will not do for counsel to tell the jury to take some theory of theirs, unless the evidence sustains that theory. In other words, gentlemen, you should decide the case wholly and entirely upon the evidence that has been given in court, and not upon any statements, or declarations, or assertions of counsel on either side.

[Now there has been something said about the possible alteration of this paper. Who altered it? The insinuation is that John McCormick had some interest in it. There is not a particle of evidence here, gentlemen, that John McCormick ever knew about this paper, or what it was, until some time in February. Not a particle of evidence that he had anything whatever to do with the getting up of this paper.] [1]

Now one of the questions submitted to you is whether this paper was secured by undue influence, fraud or imposition. I do not think there is a particle of evidence that would justify you in finding that there was either undue influence, fraud or imposition practiced in getting the signature of Joseph McCormick to this paper, if he signed it. [Undue influence is where an heir, a child for example, acts upon the parent, and gets that parent to give that child a greater portion of an estate, or where some party drawing a will has a legacy in that will, some personal interest in it, and exerts personal influence over the testator to get some benefit.] [2] Now the parties concerned in drawing up this paper had no interest whatever in it. There could not be any undue influence in drawing the paper, so far as they were concerned, and, if you believe their testimony, there was no fraud practiced by them, because they made no suggestions to Mr. McCormick at all, how to make his will, or what statements to make. That is their testimony, and there is nothing to contradict that. The question as to whether the

whole thing is a fraud, I will come to presently, but I am now speaking on the theory that this paper was signed on that night.

Another question is, was Mr. McCormick, at the time he signed this paper, of testamentary capacity. It does not mean that a man must have all his mental powers as vigorously as when he was in health, it does not mean that. A man may be very feeble physically, and very weak mentally, and yet he may make a will, provided he knows what he is doing, has an intelligent conception of the act. If we did not hold that as law, nearly every will drawn by a man when he was very sick would be set aside. It does not mean that a man should have a mind capable of making all the contracts of life; that is not what is meant by testamentary capacity. It is just this: When a man makes his will, has he a clear conception of what he is doing, or who his heirs are, of the property he has, and what disposition he is making of it? If he knows that, he has testamentary capacity, although he may not be able to make any other contract whatever.

Often, too, the will itself may bear upon the question of undue influence, or it may bear upon the question of mental capacity. If a man makes an unreasonable will, one that on the face of it seems to be unreasonable, that is some evidence on the question of testamentary capacity or of undue influence upon him.

Now this paper has but two thoughts in it. One is, that he wants his brother John to attend to the business of his mother and his business, and the other thought is that John is to have $3,000 more than the other heirs. Those are the only two thoughts in this paper. Did he understand what he was doing? Did he understand what he meant that John should do and have? If he clearly understood that, he was capable of making this paper. Bearing upon that, he states, according to this paper, that he wanted John to finish up his mother's business that he had not finished; showing that he was thinking about that at the time—I mean, if you believe what the witnesses say—that he thought about his mother's estate, and that he hadn't it settled, and that he wanted John to settle it up. Then he wanted John to attend to his business if he did not live; and then the other thought is, John is to have $3,000 more than the other heirs. He thought of the other heirs; he thought of his other

brothers and sisters; he did not cut them out, and he did not give everything to John, but the thought was that John was to have $3,000 more than these other brothers and sisters. A man has a right to prefer one of his brothers or one of his children and give a preference. A man may think more of one brother than the others, either because that brother has been more kind to him, or for any other reason; he may desire to make a preference of one brother, and he has a legal right to do it, and the others have no right to complain if he understands at the time what he is doing. [And gentlemen, there is not so very much difference here. This estate is worth $16,000; John takes out $3,000; the remainder would be divided between the whole five, because the children of a deceased sister would take what their mother would have taken, so they would each get one fifth of $13,000, if John gets this $3,000 first, each of them would get $2,600; and if John did not get any out, the whole $16,000 would be divided among the five, and they would only get $3,200 a piece. It only makes a difference of about $600 to each of these four other parties. Is that unreasonable? Was it unreasonable in Joseph McCormick to make that preference, in favor of his brother John?] [3] Evidently from the paper, he contemplated and bore in mind that he had other brothers and sisters, because he says that John is to get $3,000 more than his equal share with the other heirs. The character of that paper and the nature of it can be considered by the jury bearing upon the question of his mental capacity at that time, and also as to whether there was any fraud practiced, and also as to whether these parties have manufactured that will.

[The second question is, had the testator, at the time of the signing of that paper, testamentary capacity? I take very little stock, gentlemen, in doctors as expert witnesses. We have seen in court many a case where there were three or four doctors on each side and they will testify directly contrary to each other. Now, to show that, in this case: One of these doctors, called in as an expert, testified, basing his testimony upon the testimony of the attending physician, and his idea of typhoid fever. He said that Mr. McCormick had not mental capacity to transact any business; a pretty broad assertion. When asked the question, "What do you mean by that, do you mean that he was not capable of making contracts?" "Yes, that is what

I mean." What does his testimony amount to? Because, a man may have capacity to make a will, and not be able to make contracts ; but that is his idea of the mental capacity a man would have to have to make a will, and that is not the law.] [4] So, other witnesses may testify that a man has not mind enough to make a will. What do they understand as necessary to make a will? They may have a very erroneous idea; they may think a man must have his full powers just the same as in health before he can make a will. Now such is not the law.

[The question here presented to you gentlemen is this: Did Joseph McCormick, on this night, between 12 and 1 o'clock, on December 16, 1896, make this statement to Buntin, and did Buntin write it down there at the time, and was it signed by Joseph McCormick through Buntin, and by his direction, and did he request both of these witnesses to witness it? If so, it is, I think, evidence enough to justify the jury in finding that he had mental capacity to make that statement.] [5]

[But it is suggested that the whole thing is a fraud; that these parties never got such instructions from Joseph McCormick, and that on some occasion, Buntin manufactured this paper and got it up as a fraud, and that he and Beers have both committed perjury here in their testimony. We cannot excuse Beers. Beers testifies that he was called to go in from the other room by Buntin and that when he went in there Buntin had the paper, that Buntin had a book and that he laid the paper on the book, and that he heard Mr. McCormick state what was to be written, and he stated to you what McCormick said—the substance of this paper—and that McCormick requested him to witness it, and that this occurred on that night, the first night that he was there at the house. Beers swears to all this. He cannot possibly be mistaken, unless he is dreaming ; it is either true or it is wholly false. So it is with what Buntin says; either he testified to the truth here, or he has manufactured the whole thing and is guilty of perjury in his testimony here.

Now it has been argued, gentlemen, that you cannot believe him, because he has been contradicted, and that where a man is false in one thing, you are to reject his whole testimony. That is not the law as broadly as it is asserted. If a man testifies falsely knowing it is false, in one particular, you may then disregard his testimony, but he must know that he is testifying

falsely in some material matter before the jury can reject his testimony entirely. There may be little discrepancies about minor matters, not material in the case. Witnesses may forget, or, in narrating the same circumstance, a party at one time may add something that he did not state at another time; that is not a contradiction. Why, gentlemen, you could narrate something that occurred a week ago and, then, on another day, if asked to narrate the same thing, you could not use precisely the same words; you would probably add something or omit something in one of the statements. If you used precisely the same words on both occasions, it would be very suspicious. These little discrepancies, immaterial as to the important matters, are of very little consequence.

Now it is also argued that Buntin's testimony is contradicted by the doctor. Well, there are some contradictions there of little matters, and so with the others, as to what occurred on December 16, 1896, and during that week or the following week, during the sixteen or seventeen days that McCormick was sick; but no question arises about it for some six weeks, when it would be almost impossible for a person to narrate what occurred during those sixteen or seventeen days, such as the hours of the day or the day of the month, unless there was something to fix it. There is nothing more uncertain in a man's recollection than the hours of the day or the days of the week or the days of the month. When you look back six weeks and try to recall where you were, and what conversations you had with a man six weeks ago, and try to narrate the same circumstances, it is pretty difficult to do it, very difficult to recall everything. I do not suppose, gentlemen, that any of the witnesses here for the defense—not for an instant would I think that one of them would come forward here and testify falsely, knowing they were doing so; I do not believe it; but they may be mistaken in some of these things, and so the plaintiff's witnesses may be mistaken in some immaterial matters; but Buntin fixes the day of this occurrence in this way: At first this paper was dated December 22, he says, but when John McCormick and his brother came there and this paper was opened and read on that occasion, then the question arose, what day Beers came there to work; John McCormick, turning to his book, said it was the 16th day of December that Beers came there to work, and then

Buntin said, " This date is wrong ; I'll change it to the 16th,"
and John McCormick said, " No, let it alone." It is not ma-
terial, gentlemen, whether it was changed or not at that time,
but the point is this, that Beers and Buntin fix the date from
that circumstance, from McCormick's book as to the 16th. The
other witnesses, no doubt honestly, talking about this thing
(they have been talking about it perhaps for a year or more)
may get dates and circumstances and occurrences all arranged
very naturally and very honestly in their minds, and yet there
may be mistakes in these things. It is argued that the testi-
mony of the doctor flatly contradicts Buntin on the question of
mental capacity. What does the doctor testify? I think he
said he had no conversation with Joseph McCormick, except
in reference to his condition; that some times he would be there
but a short time, and ask him how he was, how he felt, or some-
thing of the kind.] [6] . . . .

That may all be true, gentlemen, and yet he may have had
mental capacity at the time this paper was signed. . . .

The last question you are called upon to answer is this : Is
this paper the act of Joseph McCormick? That raises the ques-
tion, is it a fraud? Is it a fraud entirely? If so, then of course
it is not the act of Joseph McCormick. But if it was executed
as these witnesses testify, and he had mental capacity sufficient
to make it, then it is the act of Joseph McCormick.

Now, I have drawn for you what will be the form of your
verdict. In these cases we have to make the verdict a little
peculiar. I will read the verdict. " On the three questions
submitted by the orphans' court, the jury find as follows, to wit:
the first question, " whether there was undue influence, fraud
or imposition used to procure the execution of the said paper."
That is the first question. [Now, I have said to you that I do
not think there is any doubt that there was no fraud or impo-
sition practiced in getting him to sign that paper, not a particle
of evidence of it.] [7] You answer that, then—that is for you
to find—" We find there was no fraud, undue influence or im-
position practiced." If you believe there was, why of course
you say, " We find there was fraud," or you say, " We find there
was not, according as you find the fact to be." Second, whether
at the time of signing said paperwriting the said Joseph Mc-
Cormick was possessed of testamentary capacity. You will

_answer that, " We find he was " or " He was not." Then the third question, " whether the said paper writing is the act of the said decedent." You will answer, " We find it was " or " It was not," just as you may find from the evidence. And then, upon the whole case, " We find for the plaintiff " or " for the defendant." You will add·what is necessary to fill out the blanks that I have prepared.

Verdict and judgment for plaintiffs.    Defendants appealed.

*Errors assigned* were (1–7) above instructions, quoting them; (9) that the charge as a whole was misleading.

*Thomas M. Marshall, Jr.,* with him *A. H. Mercer* and *Frank P. Sproul,* for appellants.

*S. B. Donaldson,* for appellee.

OPINION BY MR. JUSTICE MITCHELL, December 30, 1899:

This is an issue devisavit vel non on a paper purporting to be the will of Joseph S. McCormick, wholly in the handwriting of a third person, including the testator's name, but claimed to have been written in testator's presence and at his dictation, and signed by the witness for him at his request, he being too weak and nervous to sign it himself, but touching the pen while his name was written.

On the issues directed by the orphans' court the jury found specifically first, that there was no undue influence, fraud or imposition used to procure the execution of the paper; secondly, that at the time of the signing of the said paper the testator was possessed of testamentary capacity, and thirdly, that the said paper was the act of the decedent. This disposed of the whole case in favor of the plaintiffs.

The contest turned almost wholly on the credibility of the witnesses. Buntin, who wrote the paper, testified positively to the act of the decedent in calling him, dictating what he should say, and directing him to sign decedent's name while the latter touched the pen. Beers, the other witness who claimed to have been present, corroborated him. On the other hand, there were some discrepancies, if not contradictions, in

their testimony, and some subsequent conduct of Buntin in regard to the paper, suspicious, difficult of explanation consistent with his story, and giving a basis for the contention of the defendants that the paper was fraudulently gotten up after the decedent's death, and sustained by perjury.   There was also a considerable amount of testimony on the part of defendants going to show a condition of illness on the part of the decedent at the time of the alleged transaction, that rendered him incapable of intelligently doing the acts testified to.   It is not necessary to go into further detail.   A verdict either way could not be said to be without evidence to support it, and the real contest, as already said, was one of the credibility of the witnesses.   This the jury passed upon.

All the assignments of error are to the charge, and especially to the mode of presentation of the case to the jury.   The charge, it must be admitted, comes in more than one place dangerously close to the line of trespass on the jury's province.   But there was no erroneous statement of the law, no suppression or distortion of the evidence, and the expressions complained of, though showing very strongly the judge's opinion on the merits of the case, do not impose that opinion as binding on the jury.   It would serve no useful purpose to go over them in detail.   They are all open to the objection of approaching the danger line, but are all nevertheless within the limit permitted. It was a case of the class where the judge sits as a chancellor, and must be allowed a very large discretion in his control of the findings.   We cannot say that his privilege in this respect was carried quite to the point of error.

Judgment affirmed.