## Klein's Estate.

*Will—Issue devisavit vel non—Testamentary capacity—Evidence.*

On an application for an issue devisavit vel non, the opinion of physicians and others that the testator did not have testamentary capacity, based on their observations of his mental weakness and lack of memory, cannot prevail against positive evidence that at the time the will was made testator knew his children and their names, knew what property he owned and what disposition he wanted to make of it, was at the time doing business in his own name, signing checks, writing letters, conducting a mercantile business, and running a hotel completed by him.

Argued Oct. 14, 1903. Appeal, No. 4, Oct. T., 1903, by Elizabeth Klein Schopperle, from decree of O. C. Clarion Co., Aug. T., 1900, No. 35, refusing issue devisavit vel non in estate of Frank Klein, deceased. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Petition for issue devisavit vel non.

CRISWELL, P. J., filed the following opinion:
The petitioners ask for an issue in this matter on two grounds: First, for the reason as alleged that the deceased did not have sufficient mental capacity to make a will at the time he executed the testamentary writing bearing the date the 18th day of October, 1897, and second, that at the time of the execution of the said writing he was under the duress of undue influence.

As to the second contention noted it is necessary only to say that there is no evidence to sustain it. As to the first, much evidence has been offered which demands consideration.

The deceased for many years resided at East Brady, in said county, where he died on February 21, 1899, at the age, as we understand, of about fifty-four years. He left surviving him a widow, Maggie Fox Klein, and four children by a former wife, vis: Kate, intermarried with Charles Newlon; Lizzie, intermarried with V. Schopperle; J. Alfred Klein, and Frank Klein. Neither the date of the death of the first Mrs. Klein nor that of the marriage of the deceased to the second is given in the evidence, nor is the respective ages of the children given. It appears, however, that Mrs. Newlon left home and was married in 1878 while Mrs. Schopperle was married in 1881 and did not thereafter reside at home. Frank is a member of the bar of this county.

J. Alfred was married in 1894 but neither he nor Frank was called as a witness, and the evidence discloses but little information relative to them. We infer that they are in middle life and that the second marriage of the deceased occurred quite a number of years prior to his death.

For many years preceding his death the deceased was engaged in the hotel and retail liquor business and in merchandising. He was addicted to the use, to a considerable extent, of intoxicating liquors and was frequently seen under its influence. According to Dr. Wallace, his family physician and a witness called on behalf of the contestants, he drank regularly and a great deal. He was likewise afflicted with asthma during his late years and in 1895 had a slight stroke of apoplexy.

As to the facts thus generally stated there appears to be no controversy. But the contestants allege further that by reason of or in connection with the stroke of apoplexy he was afflicted with a sort of dementia growing progressively worse until his death, which affected and impaired his mental powers. In support of this contention two physicians and several others were examined at length and express the opinion more or less positively that he was, in October, 1897, incapable of making a will.

As to what in law constitutes sufficient mental capacity to make a will there appears to be no controversy or uncertainty,

It is always presumed to exist until the contrary is shown. A familiar saying is that it requires less capacity to make a will than is generally required to transact ordinary business. In the case of Thompson v. Kyner, 65 Pa., 368, the authorities on the subject are collated by THOMPSON, C. J., and the following summaries, some affirmative and others negative in form, are given. "The result of the best considered cases seems to put the question of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction ; or, in popular phrase, that the testator should, at the time of executing the will, know and understand what he is about." "Old age, failure of memory, or habitual drunkenness will not (per se) constitute incapacity to execute a will." "If the testator was at the time capable of understanding the nature of the business and the elements of the will, that is, the nature and extent of his property, and the persons to whom he meant to convey it, and the mode of distribution, it is sufficient." "To understand in detail all that he is about is quite sufficient ;" and, quoting Daniel v. Daniel, 39 Pa. 191, "A sound and disposing mind and memory is one in which the testator is shown to have had at the making and executing of his will a full and intelligent consciousness of the nature and effect of the act he is engaged in ; a knowledge of the property he possessed ; an understanding of the disposition he wished to make of it by will, and of the persons and objects he desired to participate in his bounty. It is not necessary that he should collect all these in one view. If he understands in detail all he is about and chooses with understanding and reason between one disposition and another, it is sufficient."

An opinion as to mental testamentary incapacity not based upon sufficient facts or based upon an erroneous conception as to what in law constitutes testamentary incapacity must have but little weight, and must necessarily be disregarded where the evidence shows the presence of those facts and conditions which accompany and constitute mental capacity. With these summary statements of the law in mind we will consider the evidence more in detail.

Dr. Wallace says that the deceased had, about the year 1895, a light apoplectic stroke and that he then commenced to have enfeeblement of the mind and that his impression is that

he gradually became worse. That the stroke made him very forgetful and weak minded; that he would start to say something and when he got through a sentence he would forget what he was going to say. The doctor usually treated him at his office, where the deceased came for treatment, had no memoranda of the dates of his treatment in the fall of 1897 and but little recollection of it, but his opinion is that he was worse in 1897 than the year before. On substantially these facts, in connection with the fact that he saw him frequently, given in his examination in chief, he expresses the opinion that at no time in 1897 had the deceased mental capacity sufficient to make a will. On cross-examination he states that he does not know that he had any delusions or hallucinations, that his difficulty was more an enfeeblement of mind resulting from old age and the stroke of apoplexy,—what he would term dementia. He admits that he was about his places of business but doesn't think he took much part in the management of it; that he had a marked degree of failure of memory, a very defective memory but when he wanted treatment he would come to him and tell him about his ailments; that he knew his family; that the witness didn't know much about him except as a physician; that the deceased was a German, moderately successful in business. In giving instances of forgetfulness he says that the deceased would come to him for medicine; that next day he would come back and make the same complaint and want more medicine. When I would tell him I had prescribed for that, he would say I forgot. The doctor was then asked this question, " Doctor, if Mr. Frank Klein on October 18, 1897, knew his children and their names, knew what property he owned and what disposition he wanted to make of it at that time, and was doing business in his own name, signing checks, writing letters, conducting a mercantile business and running a hotel just completed by him, would you still say that he would not have sufficient mental capacity to make a will? " In view of the evidence subsequently educed on the part of the proponents of the will, this was an important question, going directly to the point in issue, yet the doctor very ungracefully evaded it and failed to make any answer thereto by saying, "I would say from my knowledge of Mr. Klein that he was incompetent at that time." He then in redirect refers to his drinking habit as hereinbefore mentioned.

Dr. James states that he prescribed for and furnished medicine to the deceased several times in September and October, 1897, that he was then excessively nervous and very incoherent in his conversation; wanted something to make him rest; didn't want anything for asthma; that he understood his ailment then was excessive nervousness, and gave him something to quiet his nerves; that he thought at the time he was under the influence of morphine, judging from his actions; again he wanted something for asthma which Dr. Wallace had prescribed; that he brought a bottle the medicine had been in and the witness filled it but he never came for it; that it couldn't help being noticed that he wasn't himself the latter part of September and October; noticed that he was very incoherent. If he started to describe something he would get entirely off his subject and would contradict what he said the day before,—something of that sort. The doctor then expresses the opinion that he was not of sound mind and that his condition was caused by his brain trouble, and that he was not of sufficient mental capacity to make a will of any length—hadn't the power of concentration.

On cross-examination he says that the latter times he came to see him he had not that undue excitement—the medicine would relieve that; that he was what the witness calls weak-minded,—could remember some things; knew me; told me what he came for and knew he was sick; supposed he knew his family and what property he had; that he didn't tell his wife or any one then that he was of unsound mind or that he ought not to be allowed to attend to his business. Speaking of the time of making the will he says in substance: " I suppose he would know on October 18, 1897, that he was engaged in making a will; don't know that he didn't know his children or that he didn't know what property he had, yet think he was weak-minded and incompetent to transact any ordinary business."

Other witnesses including his two married daughters were called on behalf of the contestants. These testify to forgetfulness in reference to various matters; to his physical condition at various times, and to conversations with or remarks made by him which are relied on as tending to show weakness of mind and mental incapacity. These, however, are of

such a character that when taken in connection with the admitted facts of nervousness, the use of liquors and ill health, they throw but little light upon the testamentary capacity of the deceased at the time of the execution of his will.    The most important witnesses called were the two physicians whose testimony we have noted more at length.

. As against these we have the fact that the deceased was, until sometime after the date of the execution of his will, in the actual control and management of his merchandising business; that when his hotel building was destroyed by fire in the early part of 1897 he looked after the adjustment of the loss and collection of the insurance thereon; that he proceeded shortly thereafter to erect a new hotel building which was nearing completion at the time of the making of the will in question; that in company with his wife he went to Pittsburg and bought furniture for the same, and, upon its completion, looked after the procurement of the license therefor, and in all these matters there is no pretense but that he exercised good business care and judgment.    Most of his quite extended correspondence, it is true, was done by Miss Sweeney who was his bookkeeper and clerk in the store.    But she says that what she did in his name she did by his direction with some trivial exceptions which were referred to by her.    An examination of this correspondence discloses not only ordinary care and judgment, but exceptional care, forethought and judgment, together with business methods which account for the measure of success which he had in the accumulation of property.    To the preparation of his will he gave like care and consideration.    The first will of which mention has been made was prepared by J. T. Maffett, Esq., after full conference and consultation with the deceased.    Afterward he desired some modifications therein in the interest of those who were to receive the estate in reversion on the death of the widow.    The will was rewritten and these modifications were inserted by Haggerty, Esq., evidently a very competent and intelligent layman, who resided in the vicinity of his home. Neither in what transpired in connection with the preparation and the execution and witnessing of the will, nor in the terms thereof was there anything to suggest to any one that he was not mentally competent to make the same.    Nor does it appear even to have occurred to those with whom he dealt and con-

tracted at the time of and immediately before and after its execution that he was not amply able and competent to protect his own interest. So far as disclosed by the evidence such appears never to have occurred to his children, the contestants, until after his death. The husband of one of them prepared, or caused to be prepared, a will to be executed by him, and it appears, submitted it to the deceased and conferred with him in reference thereto shortly prior to the date of the one afterward executed by him. This is practically the only evidence we have of any suggestion having been made to him by any of the family on the subject. Instead of adopting such paper, however, and executing it as his will, he caused one to be prepared in terms to suit himself without conference with any one except those whom it was necessary to consult in order to its due preparation and execution.

In the face of these unquestioned facts, the opinions of the physicians and others that he did not have mental capacity, based on no other facts than those given by them cannot prevail. No one can carefully read and consider all the evidence offered in this inquiry and not conclude without hesitation or doubt that the deceased knew at the time of the execution of his will what he was doing ; knew the members of his family and their relationship to and claims upon him ; knew what property he had, the character and value thereof, and knew definitely, certainly and intelligently, just what he wanted to do with it. Such being the case, if an issue were awarded and a jury should return a verdict in favor of the contestants, it would be the duty of the court to set it aside. We should, therefore, refuse the issue. To do otherwise would, in our opinion, to use the language of Justice PAXSON in Eddey's Appeal, 109 Pa. 406, be a grievous wrong.

And now, April 14, 1902, after due consideration the prayer of the petitioners for an issue in the above entitled matter is refused and the petition is dismissed at the cost of petitioners.

*Error assigned* was the decree of the court.

*Frank Klein*, with him *S. K. Clarke* and *G. G. Sloan*, for appellant.

*W. A. Hindman*, with him *H. M. Rimer*, for appellee.

PER CURIAM, November 9, 1903 :

The opinion of the learned judge below, after a painstaking and accurate review of the whole case, concludes that while there is some evidence which tends to sustain the contention of the appellants, yet taking it as a whole the proof of testamentary capacity is so clear that a judge would be bound to set aside an adverse verdict if rendered. In this conclusion we unanimously concur, and the judgment is therefore affirmed on the opinion.