Cookson's Estate.

82

Argued November 27, 1936.   Before Kephart, C. J., Maxey, Drew, Linn, Stern and Barnes, JJ.

*Thomas S. Lanard,* for appellant.

*Langdon W. Harris, Jr.,* of *Herman & Harris,* for appellee.

OPINION BY MR. CHIEF JUSTICE KEPHART, January 11, 1937:

Adelaide V. Cookson, a widow, died December 18, 1933, at the age of eighty-two years. She was survived by her three children, Albert H. Brown, of California, Ralph Cookson, of Chicago, and Florence M. Crawford, of Philadelphia, and left a will, dated June 23, 1932, with a codicil, executed on December 14, 1933. Under the will testatrix gave $100 to her daughter, the residue to be divided equally between her two sons, Albert and Ralph. By the codicil she increased her daughter's share to one half of the residue and reduced that of her sons to one quarter each. After probate an issue was awarded by the Orphans' Court to determine decedent's testamentary capacity at the time the codicil was executed and whether it was procured by undue influence. The jury found both testamentary incapacity and undue influence. Florence Crawford appeals, assigning as error, among other things, the failure of the trial court to direct the jury that there was not sufficient evidence to sustain the charge of undue influence and in charging that ordinarily the physician in attendance is best qualified to pass upon the mental capacity of a testator.

Decedent and her daughter frequently quarrelled, and there existed a feeling of ill-will between the two at certain times. After one of these quarrels decedent left her daughter's home, where she had been living and made the will giving her daughter only $100. In the summer of 1933 her daughter became ill and a complete reconciliation was effected according to her testimony.

On Thanksgiving Day, 1933, decedent took cold while visiting her daughter. She became progressively worse and on December 5, 1933, Dr. Donnelly was called to see her at the house of a Mrs. Acuff where she rented a room. It was his first visit. He found her very sick, suffering from a high temperature, and on December 12, 1933, diagnosed her illness as bronchial pneumonia. She was sent to Temple University Hospital on December 13, 1933, where she later died.

Decedent's daughter testified she visited her mother at about 3 o'clock in the afternoon on December 14, 1933, and that her mother asked her to send for Mr. Foster, who had been her mother's business agent for many years and was draftsman and executor of her will, telling her the changes she wanted to make. Mrs. Crawford telephoned Mr. Foster, who arrived shortly thereafter and went directly to decedent's room, where the daughter told him of her mother's wishes. She then left the room at his request. Foster related he informed decedent of the meaning of her proposed act and asked her reason, since he was aware of the bitter feeling which had existed between them. He said decedent again expressed her wish to make the changes, explaining she did not want to die with any bitterness toward her daughter. He drafted the codicil, and, in the presence of two nurses, a doctor, Mrs. Crawford and himself, decedent, propped up in bed, attempted to sign the document. She was too weak to complete her signature legibly and made her mark while he guided the pen. He said that after the execution of the codicil, decedent requested him to make arrangements whereby her daughter could withdraw money from her bank account to pay the hospital bills and also asked whether the interest had been paid on one of her properties. Both Mrs. Crawford and Mr. Foster testified that decedent was rational, wide awake and fully understood what she was doing.

In contrast to this evidence, Dr. Donnelly testified that decedent was very sick and extremely toxic on December 14, 1933, when he saw her at noon. He expressed the opinion that her mind was sufficiently affected by her illness to render her incompetent mentally to understand the meaning of her act. He admitted she might have known her name, kin and the property she owned, but said she would not have a clear concept of the manner in which it was to be distributed. It was his opinion that her condition was the same, if not worse, at three o'clock as at noon, although he conceded she might have experienced more rational moments at the times when she was quieter. He said he had not made a mental test, and admitted his opinion was based solely on general observation plus physical examination. Dr. Bender, a witness to the codicil, testified that decedent was in a dazed condition and did not appear to comprehend what she was doing. Another witness to the codicil testified that decedent was in a semi-comatose condition when she entered the room and had to be aroused. Both testified decedent fell back exhausted before completing her signature. These witnesses were confronted with their affidavits before the register of wills wherein they stated testatrix had testamentary capacity to the best of their knowledge.

Other witnesses, friends of decedent, said decedent told them her daughter wanted her property but she would not give it to her. There was considerable evidence of decedent's dislike of her daughter, who was alleged to have been abusive to her. The son from Chicago stated that ill-will existed between Mrs. Crawford and himself. Mrs. Crawford did not deny quarrelling with her mother but said there had been a complete reconciliation in August, 1933. Corroborative of this assertion is a letter written by testatrix to her daughter, and the testimony of Mrs. Acuff that decedent embraced and kissed her daughter on at least two occasions during this period.

The burden rested upon the contestant, Brown, to prove both undue influence and lack of testamentary capacity. The invalidity of a will for these reasons must be established by the manifest weight of evidence,[1] and the testimony as a whole must support the verdict.[2] In such an issue the judge acts as a chancellor and should not permit the finding of a jury to stand which is contrary to the weight of the evidence.[3] While testatrix was extremely sick when the codicil was written, no confidential relationship was shown to exist between her and appellant. The fact that proponent is a daughter does not of itself constitute such confidential relation as would shift the burden of proof.[4] These principles are too well settled to require further elaboration.

A thorough examination of the record does not sustain the finding of the jury that undue influence was exercised. There is nothing to show persuasion or solicitation to change the will in favor of appellant, aside from the fact that persuasion or solicitation in themselves do not constitute undue influence.[5] The facts that appellant sent for Mr. Foster, the scrivener, at decedent's request,[6] that she, as the chief beneficiary, was in the hospital room at the time testatrix executed the codicil,[7] and that there was a departure from an existing will do not establish undue influence.[8] An unequal distribution in a will is only important in doubtful cases and then it acts as a make-weight only.[9]

---

[1] *Lawrence's Estate*, 286 Pa. 58, 64.

[2] *Guar. T. & S. D. Co. v. Heidenreich*, 290 Pa. 249, 251.

[3] *Central Trust Co. v. Boyer*, 308 Pa. 402, 408.

[4] *Aggas v. Munnell*, 302 Pa. 78, 88.

[5] *Brennan's Estate*, 312 Pa. 335, 337; *Koons's Estate*, 293 Pa. 465, 470; *Aggas v. Munnell*, supra, at p. 88.

[6] *Aggas v. Munnell*, supra, at p. 87.

[7] *Minnig's Estate*, 300 Pa. 435, 438; *Francis's Estate*, 299 Pa. 398, 402.

[8] *Koons's Estate*, supra, at p. 470; *Guar. T. & S. D. Co. v. Heidenreich*, supra, at p. 256.

[9] *Herster v. Herster*, 122 Pa. 239, 259, 260.

Testatrix's declarations to the effect that her daughter wanted to get her property but she would not give it to her are not in themselves substantive evidence of undue influence but are only corroborative of more direct evidence which does not appear in the record.[10] That her daughter may have had an opportunity to exercise undue influence which was not availed of,[11] or that there are circumstances which give rise to mere suspicion are not enough.[12] Viewing the evidence in its entirety and considering the combined circumstances as a whole, appellee failed to establish undue influence by the weight of evidence and the court below erred in submitting that question to the jury.

Appellee strongly contends that the uncontradicted testimony of decedent's critical and enfeebled condition combined with the other evidence entitled him to go to the jury. This contention loses sight of the fact that undue influence must be shown by evidence of restraint, coercion or improper conduct subjugating the testator's mind to the will of the person operating upon it. This is a necessary element to establish a prima facie case.[13] Evidence of weakness of mind or an enfeebled condition shows the degree of susceptibility of the testator's mind to outside influences. It is competent evidence on this issue, and is so closely linked to testamentary incapacity that it may be extremely difficult to consider one apart from the other.[14] However, a prima facie case of undue influence cannot be made out from such testimony without more; there must be evidence, direct or

[10] *Ries v. Ries's Estate,* 322 Pa. 211, 219, 220; *Herster v. Herster,* supra, at p. 256.

[11] *Conway's Estate,* 257 Pa. 314, 316; *Tyson's Estate,* 223 Pa. 596, 598.

[12] *Masho's Estate,* 303 Pa. 56, 58.

[13] *Phillips's Estate,* 244 Pa. 35, 43; *Herster v. Herster,* supra, at p. 252.

[14] *Lawrence's Estate,* supra, at p. 66; *Koons's Estate,* supra, at p. 471.

circumstantial, of improper conduct sufficient to domi-
nate or control testator's mind. As the record in this
case is void of such evidence, there is nothing upon
which a finding of undue influence could be predicated.

The trial court charged with respect to the attending
physician's testimony: "You should consider the testi-
mony of Dr. Daniel J. Donnelly, the physician in at-
tendance on Mrs. Cookson, bearing in mind that a phy-
sician who has been in attendance upon a patient for a
considerable length of time is ordinarily best qualified
to pass upon the mental capacity of a testator." This
instruction unduly emphasized the importance of Dr.
Donnelly's testimony as contrasted to that of Mr. Fos-
ter, the scrivener and business agent of decedent for
many years. This court has stated on many occasions
that expert medical opinions are of little weight when
based upon insufficient facts or an erroneous conception
of testamentary capacity, and should be entirely disre-
garded when contrary to established facts revealing
mental capacity.[15] Furthermore such opinions are of
very doubtful value where they are purely theoretical
in character, and the physician is ignorant of the ac-
tual facts upholding or negativing the existence of tes-
tamentary capacity.[16] In the instant case Dr. Donnelly's
testimony is far less convincing than that of Mr. Foster,
assuming both told the truth. Mr. Foster had been de-
cedent's agent for a long period of time and was fully
conversant with her ability to supervise her business
affairs. If she was as mentally alert as he testified and
actually conversed with him in the manner related by
him, it is evident that she possessed testamentary ca-
pacity. She not only explained to him her reason for
changing the will, but arranged to have her hospital
bills paid, and inquired as to an interest payment on

[15] *Klein's Estate,* 207 Pa. 191, 193; *Lawrence v. King,* 299 Pa.
568, 578; *Guar. T. & S. D. Co. v. Heidenreich,* supra, at p. 254.

[16] *Phillips's Estate,* 299 Pa. 415, 422, 423.

her property. On the other hand, Dr. Donnelly saw her for the first time on December 5, 1933. His opinion was based solely on his general observation plus the fact that his physical examination showed him she was extremely toxic. He admitted he made no examination to determine her mental capacity. The essence of his testimony is that the degree of toxicity from which she was suffering would render her mentally incompetent to understand the meaning of her act and to whom her property would go. He did not relate any actual facts definitely establishing this conclusion or evidencing in reality such mental weakness on her part. He did not see her for more than three hours before the codicil was executed and admitted he did not know definitely her mental condition at that time, but stated that in her condition her mind could not have been clear. It is obvious that his opinion, based almost solely on her physical condition, could have little weight in face of the facts testified to by Mr. Foster, if the jury found him to be worthy of belief. The court's charge unequivocally placed Dr. Donnelly's testimony on a much higher plane than that of Mr. Foster, if not conclusive of the question, and warranted the jury in finding testamentary incapacity on the basis of his medical opinion, even though they might believe the scrivener. This was prejudicial error and in itself requires a new trial.

Judgment reversed and a new trial is awarded.