## Geist's Estate.

Argued January 18, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Theodore Lane Bean,* for appellant.

*Jesse R. Evans,* for appellee.

OPINION BY MR. JUSTICE LINN, March 22, 1937:

This appeal is from the refusal of an issue devisavit vel non. Section 21(b) of the Orphans' Court Act, 1917, P. L. 363, 382, 20 PS section 2582, provides: "Whenever a dispute upon a matter of fact arises before any Orphans' court, on appeal from any register of wills, or on removal from any register of wills by certification, the said court shall, at the request of either party, direct a precept for an issue to the court of common pleas of the county for the trial thereof. . . ." The facts alleged by appellant to be in dispute, within the terms of this section, are whether testatrix had capacity to make a will and whether she was unduly influenced by Dr. Heffner in making it.

The testatrix died of erysipelas at about seven o'clock in the afternoon of March 31, 1934, in the Pottstown Hospital. She had been taken there in the afternoon of March 30th from the farm on which she resided near Pottstown where she had been ill for several days. She was a spinster, about 59 years old, who had made her home with her brother, a bachelor. They had made reciprocal wills. He died suddenly on the 27th or 28th of March. She was not informed of his death until the afternoon of March 30th, either on the way to the hospital or shortly after she arrived there.

The contested will, executed during the late evening of March 30th, was written by her physician, Dr. Heffner, the appellee, who received a large part of her property and was appointed executor. It was probated and letters testamentary were granted to him. Decedent's nearest of kin were first cousins. One of them appealed from the probate and petitioned for an issue to determine, inter alia, whether "decedent was a person of sound mind" when she made the will and whether it "was procured by undue influence, duress and constraint practiced upon the said decedent by Dr. R. S.

Heffner." Heffner answered the petition, testimony was received; the case was considered and the appeal was dismissed.

If there is a substantial dispute of material fact the statute requires the issue. Heffner's position is that no dispute of fact within the rule is presented. The words of the Act of 1917 have been in our legislation since 1832 and were repeated in the Orphans' Court Act in the sense in which they had theretofore been construed by the court. The rule has been variously stated. In *Central Trust Co. v. Boyer,* 308 Pa. 402, 408, 162 A. 806, it was said: "The concern of the law is the protection of the testator and the legal objects of his bounty, to see that he has testamentary capacity, and is not over-reached by designing persons. To this end, in the trial of an issue to determine the validity of a will, the judge sits as a chancellor *(McCormick v. McCormick,* 194 Pa. 107; *Roberts v. Clemens,* 202 Pa. 198) ; the evidence is addressed quite as much to him as to the jury, and he cannot permit the jury to do what he, as a chancellor, would not do *(Caughey v. Bridenbaugh,* 208 Pa. 414; *Phillips's Est.,* 244 Pa. 35; *Keller v. Lawson,* 261 Pa. 489; *Fleming's Est.,* 265 Pa. 399; *Guaranty T. & S. D. Co. v. Heidenreich,* 290 Pa. 249). If he feels that the ends of justice call for a verdict against the will, or he is so uncertain on this point that he could in good conscience support a finding either way on one or more of the controlling issues involved, the question should be submitted to a jury, and unless, on reëxamination after verdict, the evidence proves insufficient to support their finding, that conclusion should stand, even though its effect be to set aside the will *(Tetlow's Est.,* 269 Pa. 486; *Fleming's Estate,* 280 Pa. 252; *Guaranty T. & S. D. Co. v. Heidenreich,* supra; *Mark's Estate,* 298 Pa. 285)." Reading the record in the light of that rule we understand that the learned hearing judge was of opinion "that the ends of justice [did not] call for a verdict against the will"; that he was not uncertain about it

but, on the other hand, could not have sustained a verdict against the will if an issue had been granted and the jury had found for the contestant. In other words, he found from a consideration of all the evidence that no dispute of material fact was presented by the record.

This brings us to a statement of other facts in the case supplementing those already stated. As undue influence and lack of testamentary capacity necessarily shade into each other, we shall not make a separate statement of the evidence as related to each of these two ultimate facts for the existence of which appellant contends. Dr. Heffner's father had been physician to the testatrix over a period of years, in consequence of which she had known the son from boyhood; after he reached maturity and became a physician he succeeded his father as her physician. At Christmas she was in the habit of giving him a present of $20.00. A witness, who had been a nurse in the doctor's service testified that during the 8½ years in which she had been employed by him, she saw the testatrix "an average of forty times a year"; that more than once testatrix expressed her high regard for the doctor and for his young son whom she referred to as "Bobby" saying "Bobby Heffner is the same to me as a son. If the time ever comes that he needs assistance he is going to get it, whether it is now or after I am gone." She testified that testatrix made other statements indicating appreciation of his services to her. A few days before her death she said, "I know I am going to die. I am going to remember Dr. Heffner in my will." This witness conversed with the testatrix in the hospital on the afternoon of the day before she died and testified that she "was a little better" and appeared to be "all right." "She answered all his questions (asked by Dr. Willis) perfectly sane." Dr. Willis was the head of the hospital staff.

Another witness, Mary Culbertson, testified that during Christmas week of 1933 she heard testatrix refer to

her Christmas gift to the doctor and say that "There is no one that I think of more than Dr. Heffner."

Late in the evening of March 30th, the day on which she learned of her brother's sudden death, she said, as Miss Elliott testified, "There are some things we must all do before we go." "She mumbled something, I don't know just what it was. I think she said she wanted to make a will and Dr. Heffner asked me to get a piece of paper and I gave it to him and I left the room." Dr. Heffner testified that testatrix said; "Get a piece of paper and write down what I have to say." There is evidence that Miss Elliott was first requested to leave the room by the testatrix and that the doctor then also requested her to leave. Testatrix had two nurses, a day nurse and a night nurse. During the period in which testatrix instructed the doctor what she wanted in her will the day nurse was in the adjoining room and heard nearly all the testatrix said. The doctor also testified what occurred and is corroborated by this witness as to matters which she heard while in the adjoining room. Decedent's hearing was impaired to such extent that it was necessary to speak to her in a loud voice. From the instructions of the testatrix the doctor wrote her will.[1]

---

[1] I, Lizzie S. Geist being of sound mind and of my own free will hereby declare this to be my last will, and all other wills being null and void.

To Flora Hartman I give one thousand dollars absolutely.

To Falkner Reformed Church three thousand dollars.

To Pottstown Hospital three thousand dollars.

To Bethany Orphans home one thousand dollars.

To Lester Leidy five hundred dollars.

To Geneva Leidy five hundred Dollars.

To Norman Geist five hundred Dollars and the grandfather's clock.

To Earl Schneider's daughter, Miriam, five hundred dollars.

To Elmer Borneman one thousand dollars.

All the residue of my real estate and personal property I give, devise and bequeath to my friend Dr. Robert S. Heffner who has been with me through many crises.

I hereby appoint Dr. R. S. Heffner as executor of this my last

From the Doctor's examination we quote the following: He was asked "Q. What took place then? A. I said, 'Lizzie, do you want to write your will?' She said, 'Yes, I want to write my will.' Q. Now, just detail what took place. Tell us what took place and in what sequence as far as you can. A. She started out. She said, 'Florence Hartman, I give $1,000 out and out.' I said, 'Is that all right to put that in the form of the will?' She said, 'Absolutely.' She then made those other bequests and she came down to the matter of the family of Borneman. Well, she said, 'William Borneman, should I give him $500 or what should I give?' I said, 'He has a large family, you and I have talked about his family and no matter what you do for him it will be appreciated.' She said, 'Well, give him a thousand dollars.' I said, 'Now, Lizzie, do you want this in the form of a will?' She said, 'Yes.' I said, 'We will have to have witnesses to the will.' Q. What did she say with reference to any disposition to you? A. She said, 'How about you?' I said,[2] 'Lizzie, of course I would appreciate it if you want to remember me.' She told me what she wanted to do as far as I was concerned. She said, 'You have been with me during many of the crises of my life.' I said, 'Do you want me to put that in the will?' and she said, 'Yes.' . . . Q. What, if anything, did you say to her before you got the witnesses in to sign and witness the will? A. Well, we discussed—we went over the matter of her estate. She talked about how her estate had shrunk.

---

will, and empower him to sell any or all of the real estate or personal property and give a title free and clear of liens or encumbrances.　　　　　　　　　　　　　　　LIZZIE S. GEIST.

In witness whereof I have hereunto set my hand and seal this thirtieth day of March 1934.
Witness:
　　Gwendolyn H. Elliott.
　　Reba R. Oberholtzer.

[2] Compare *Dible's Estate,* 316 Pa. 553, 556, 175 A. 538; *Cookson's Estate,* 325 Pa. 81, 188 A. 904.

She had some shares of the Boyertown Burial and Casket Company and she said if she had only sold out some five years or so ago she would have gotten almost double. Q. Did she say anything about the principal amount or the size of her estate? A. I don't recall that she did. She asked me the amount as we went along to see how much of the estate would be left. Q. After this will was written was it read over to her? A. It was read to her twice. Q. By whom? A. By myself. There is another thing. I said, 'Lizzie, what shall I do with this will?' Was that before or after it was signed? A. That was after it was signed."

The day nurse, Miss Styer, who occupied the room next to that occupied by decedent went off duty at 7 o'clock when Miss Elliott came on. She said that sometime "around eleven o'clock" she heard Dr. Heffner and Miss Geist talking; "I heard very distinctly what he said." Of Miss Geist's answers to the doctor's questions, she testified "Her answer was not as plain to me as Dr. Heffner's questions and answers were. . . ." When Dr. Heffner mentioned the name of Irving Geist "I heard Miss Geist say no"; she heard the same reply to other names suggested by the doctor. This witness also corroborated the other nurses as to what was said when they were asked to witness the will. She testified "I heard him read what sounded like a will to Miss Geist." It was "the same things that I had heard before." Asked whether she heard "any conversation between Miss Geist and Dr. Heffner relating to any disposition of the estate to Dr. Heffner" the witness replied "It wasn't very much, but I just heard the doctor say, 'I am getting something out of it.'[3] I can't tell you the amount, but I do remember hearing Dr. Heffner mentioning himself. Q. He said, 'I am going to get something out of it'? A. They aren't the words he used, but I do recall him mentioning himself." This witness

[3] The doctor receives more than half the decedent's estate.

said that before she went off duty at 7 o'clock there was nothing abnormal in testatrix's conversation; that she thought testatrix "had the mental competency or capacity to make a will." All of the witnesses agree that her face was very much swollen by the disease of which she was suffering and that to enable her to see it was necessary to open her eyelids with boracic acid solution.

The subscribing witnesses, Miss Elliott and Miss Oberholtzer, were nurses. The following refers to what happened when they came in to witness the will: "Q. What was said when Miss Elliott and Miss Oberholtzer were there and before this will was signed by the testatrix? A. I said, 'Miss Geist, now these girls are to understand that this is your will.' She said, 'Yes,' and while we were getting ready to take it over there she attempted to rise, but she could not very well do it so Miss Elliott and I helped her get up. Then I said to her again, 'These girls are to understand that this is your will and that you asked me to write it,' and then they signed it."

Miss Oberholtzer testified that Dr. Heffner asked the testatrix whether•she signed her name Lizzie or Elizabeth and she said it didn't matter. " 'Now, these girls know it is your will. These girls are here to witness it.' She gave her assent and she signed the will and after she signed we witnessed it."

The doctor testified that later when Miss Elliott was in the room he proposed to the testatrix that he read the will again to see whether she wished any changes or corrections made but that she replied "I am satisfied."

Miss Styer, who was in the next room, said "I heard Dr. Heffner ask Miss Geist if there were any changes she wanted made, and I heard Miss Geist say no, things were just as she wanted them. Q. Things were just as she wanted them? A. Yes."

The evidence of Dr. Willis is important; he was the head of the hospital staff and examined the testatrix the afternoon of March 30th and at about six o'clock that

evening and testified that then "She was perfectly capable of answering my questions in a sensible manner"; that "She answered questions intelligently" and from her conversation there was no indication of anything abnormal in her mentality.

Witnesses for contestant, testified that Dr. Heffner was reluctant to permit them to see testatrix before she was taken to the hospital. It does not appear whether this was due to the contagious character of the illness or because he thought the patient should have complete rest. One of these witnesses was the pastor of the church decedent attended. Dr. Heffner told him that she was very ill but permitted him to see her. The clergyman said her face was much swollen and that she seemed very deaf; he was in the room with her "not over twenty minutes"; he asked her whether he should pray and he understood her to assent, whereupon he did so. Another witness, Mrs. Hartman, daughter of a first cousin of the decedent, saw her on the 22nd, 27th and the 28th of March. On one of these days she found her very deaf and apparently unable to hear or understand what the witness was saying. She testified that her impression was that the decedent did not have the mental capacity to make a will.[4] She is the beneficiary of a $1,000 legacy. All the legatees, except the charities and Dr. Heffner, are decedent's first cousins or children of first cousins. Ella S. Geist, mother of Norman Geist, beneficiary of a $500.00 legacy and a grandfathers' clock, testified that on the 27th or 28th of March the Doctor refused to allow her to see the testatrix but that she had a glimpse of her on the day she was taken to the Hospital but "I didn't talk to her. She was too sick to talk." Asked whether she thought the testatrix competent to make a

---

[4] In the circumstances such opinions are of no value: compare *Klein's Estate,* 207 Pa. 191, 193, 56 A. 422; *Lawrence v. King,* 299 Pa. 568, 578, 150 A. 169; *Keen's Estate,* 299 Pa. 430, 433, 149 A. 737; *Cookson's Estate,* 325 Pa. 81, 188 A. 904, supra.

will she said, "Well, I don't know nothing of her that way."

The evidence has been referred to in some detail for the purpose of showing that much of it is of little if any consequence in establishing a dispute of material fact. Appellant stresses the challenging fact that Doctor Heffner who wrote the will is the principal beneficiary. The court has given this contention very careful consideration in the light of what is said on that subject by appellant's learned counsel. The death of decedent's brother, almost immediately before her own, increased her estate by the amount she received under his will. But the evidence will not permit us to say that she was not fully conscious of the increase of her estate or that she did not have it in mind when she made her will; on the contrary the evidence impresses us as describing a sick woman who thought she would not recover and who wished to make a will and knew exactly what she wished done with her property.

It does not appear that her intellect was so enfeebled by disease (and it is not suggested that she was mentally weak for any other reason) as to cast the burden of disproving undue influence. "The burden shifts only where there is evidence of weakened intellect": *Lawrence v. King,* 299 Pa. 568, 150 A. 169; *Keen's Estate,* 299 Pa. 430, 437, 149 A. 737; *Llewellyn's Estate,* 296 Pa. 74, 82, 145 A. 810; *Wolfe's Estate,* 284 Pa. 169, 175, 130 A. 501.

A testator may disregard his kin and leave his property to others. This record does not show any intimate intercourse between the testatrix and her first cousins or their children, but it does show, what is perhaps not unnatural in the circumstances described, a generous feeling toward the doctor extending back many years.

After reviewing the whole record and giving full consideration to all that was said by or on behalf of relatives who may consider themselves disappointed, the court is still confronted by the evidence of Dr. Willis, the head of the hospital, and four nurses who corrob-

orate the testimony of Dr. Heffner in important instance after instance. We think there is no ground for the suggestion that the testatrix was incompetent to make a will. So, too, there is no ground for finding that she was unduly influenced[5] by Dr. Heffner in making this will. Nor was she in such a condition mentally as to cast the burden of disproving undue influence upon the doctor who drew the will in the circumstances described. With the evidence in that state there is no question for the jury because, as the cases cited above show, if the jury had disregarded the evidence and made another will for her, the court would have been obliged to set aside the verdict.

The decree is affirmed, costs to be paid out of the fund for distribution.

---

[5] Undue influence is defined in *Thompson v. Kyner*, 65 Pa. 368, 379; *Phillips' Estate*, 244 Pa. 35, 43, 90 A. 457; *Wolfe's Estate*, 284 Pa. 169, 174, 130 A. 501; *Llewellyn's Estate*, 296 Pa. 74, 145 A. 810; *Keen's Estate*, 299 Pa. 430, 149 A. 737; *Brennan's Estate*, 312 Pa. 335, 338, 168 A. 25.