## Weber's Estate.

Argued March 22, 1939. Before SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*J. Alfred Wilner,* with him *Linus P. McGuiness* and *John M. Gallagher,* for appellants.

*Wayne Theophilus,* with him *Donald M. Rolston,* for appellees.

OPINION BY MR. JUSTICE SCHAFFER, April 17, 1939:

Annie E. Weber, whose will is the subject of this controversy, was 74 years old when she executed that document and when she died. She was a spinster, for years had lived alone and was somewhat of a recluse. She owned the house in which she lived and was possessed of about $17,000 in addition, which was deposited in three banks. Persons who knew her had no idea she possessed such an amount of money; they thought her poor.

She appears to have been a miser. She had a number of nephews and nieces, who are the contestants of the will and two of them the appellants.

On testimony produced before him, the Register of Wills granted a precept for an issue to the Court of Common Pleas on the questions of lack of testamentary capacity and undue influence. From this action an appeal was taken by the proponents to the Orphans' Court, which determined that as to undue influence there was no evidence whatever, and as to lack of testamentary capacity, nothing but matters of no consequence, when the testimony as to the preparation, signing and witnessing of the will are taken into account.

The testimony disclosed that testatrix was not cleanly, nor was her house. She denied herself creature comforts because of her miserliness. She did not care for her nephews and nieces and stated in her will that they had not shown any interest in her or her affairs. All her property was left to two neighbors, husband and wife, who she declared in her will "have been good to me and who have taken care of me." The husband was named as executor.

In this, as in all contested will cases, the critical time of inquiry is that of the preparation and signing of the document. If at that time testamentary capacity is shown, and undue influence is not operating, other circumstances in the life of a testator fade away in influencing judicial judgment upon the validity of the will.

What here appears on this vital inquiry is crystal clear. The testatrix was discovered ill in her home. Her feet had been frozen and become gangrenous. She was removed to a hospital. The doctor who attended her said she was of sound mind and possessed testamentary capacity. Some days after admission to the hospital, she told the superintendent when he came to her room at her request, and who never saw her until she entered the hospital, that she would like to have an attorney as she wanted to make a will. Acting upon her desire, he sent

for a lawyer, who likewise never saw her before. He came to the hospital in the evening. The superintendent remained in the room at the attorney's suggestion while he discussed with his client the terms of the will. The superintendent said she told the lawyer she did not want any of her relatives to have any of her money, as they had not paid any attention to her, and that she wanted her estate to go to her neighbors, Mr. and Mrs. Bervinkle, the contestees. The lawyer asked whether she wished to leave anything to a charitable organization and she said no. The testatrix stated the banks in which her money was deposited and the amount in round sums in each and the location of her home. No one was present in the room at the time but the testatrix, the lawyer and the superintendent. The latter testified that the testatrix was rational and possessed the capacity to make a will. Two days later the attorney returned with the will, which the superintendent said was read to her and approved. He and a technician in the hospital, Mrs. Aye, witnessed it.

On the witness stand, Mrs. Aye said she witnessed it in the testatrix's presence, the latter approving it and saying it was what she wanted and that some people might not like what she was doing. As to her mental condition, the witness stated that she seemed very clear. It is important to mention that the Bervinkles were not present when the instructions were given for the will or when it was executed. They had nothing to do with procuring the lawyer and did not know him. He did not know them.

The most important witness in the case is Donald M. Rolston, Esq., the lawyer who wrote the will, vouched for by the court below as a reputable member of the Bar of Allegheny County. He testified that on his arrival home on March 18, 1937 (the will is dated March 20, 1937), he was informed by his wife that the superintendent of the hospital had called and told her there was an old lady in the hospital who desired to make a will. He

went to the hospital, arriving there about 9 o'clock that night. The superintendent introduced him to the testatrix and he sat at her bedside, requesting the superintendent to remain in the room. He at first talked to the testatrix about generalities, which she fully understood. The superintendent remarked to her that she wanted Mr. Rolston to draw a will, to which she replied she did and wanted to have her affairs taken care of. Mr. Rolston got out his papers and pencil, asked her full name, which she gave; he then asked her where she was living and she told him; in response to his inquiry, she said she was not married. She told him about events in her past life, and stated that she had no relatives excepting seven nephews and nieces. In answer to his inquiry as to whom she wanted to leave her estate, she said there were some neighbors who had been kind to her, and had done things for her, and she wanted them to have it. He asked her whether she did not want to leave something to her relatives; she said she did not, and wanted to be particularly sure that none of her estate went to them. She described the location of the real estate she owned and went on to detail difficulties she had when her brother died. In response to the question as to whether she had any stocks or bonds, she answered that the only things she had beside her house were three bank accounts, naming the banks and in round figures the amount of money in each. She also said she had money on her person when she came into the hospital, which was true. She directed her real estate to be sold and the money given to Mr. and Mrs. Bervinkle. She spelled for the attorney the name "Bervinkle." She was anxious that she should have the use of her money while she lived and it was explained to her by Mr. Rolston that she would have it. In reply to his inquiry as to whom she wished named executor, she told him she wanted Mr. Bervinkle and desired Mr. Rolston to be named in the will as the attorney. He detailed the circumstances when the will was signed, that he had asked the superintend-

ent to act as a witness and requested him to procure another, that he read the will to the testatrix and fully explained it to her, that, in the presence of the two witnesses, he said to her that the paper produced was her will and asked whether she wanted the two persons present to witness it, to which she answered "I do," that she signed it on a little table placed before her on the bed. He told her what his charge was for preparing the will and she directed the superintendent to go down to the office and bring up her pocket book, which she herself opened, took out the proper amount of money and paid it to Mr. Rolston. He testified that she was entirely rational, knew what she wanted and was emphatic about it. In the light of this testimony and of that of the two subscribing witnesses, it would take far more evidence than the contestants produced to invalidate the will.

Much point is made of the fact that in 1895, when the testatrix was residing in Nebraska, she was in the Lincoln State Hospital for a mental derangement, which was diagnosed at that time as recurrent mania. She was discharged from that institution as recovered in 1896. Nothing was shown as to any recurrence of her ailment in the more than 40 years that elapsed between that time and the date of her will. Comment is made upon the fact that, before she went to the hospital, she delivered to the Bervinkles a satchel containing her three bank books and that through this they may have ascertained that she had a considerable amount of money in banks. Even if they did, these circumstances would amount to nothing, as the Bervinkles had no part whatever in preparing the will.

As correctly summed up by the court below, the testimony of contestants and their witnesses showed a woman living alone, whose conversation related to occurrences of long ago, who had a strange look in her eyes, who in their opinion did not speak coherently or connectedly, who was eccentric, peculiar and unusual and unclean in her housekeeping and in the care of her body. Such tes-

timony could not invalidate the will. On the other hand, evidence established that she attended to her own business continuously without the aid of anyone, that she saved her money, telling no one about it and was completely self-reliant.

There is a long line of cases which show that testimony such as that produced by the contestants is not sufficient to invalidate a will and which also show that where there is such testimony as here exists as to the preparation of the will and its execution, the will is presumed to be valid: *Brennan's Est.*, 312 Pa. 335, 168 A. 25, and cases there cited. It is not necessary to review these authorities. *Geist's Est.*, 325 Pa. 401, 191 A. 29, is a controlling authority against the grant of an issue on the record before us.

Order of the court below, reversing the precept to the Court of Common Pleas granted by the Register of Wills, and directing him to probate the will, and grant letters to the appointed executor, is affirmed at appellants' cost.